Council, please approach. Let us know who you are and who you represent. Good morning, Your Honor. For the Defendant Appellant, Michael Reeses, R-E-S-I-S. Good morning, Your Honor. It's Michael Rasek on behalf of the plaintiff, Appellee Glenn Klingelhoets. All right. You guys know the drill. Fifteen minutes aside, save some time for rebuttal. Thank you. Thank you, gentlemen. Good morning, and may it please the Court. Again, my name is Mike Reeses, and I'm here today on behalf of the Defendant Appellant. This is an appeal from a judgment entered on a jury verdict for a little bit over $700,000. We submit that the verdict was the product of substantial trial error that unduly affected the outcome. This morning, I want to discuss two of those issues. First, plaintiff's remarks in opening statements and closing arguments, six in all. And second, the trial court's exclusion of Rachel Yarrow's evidence deposition. These errors, taken separately or together, deprived defendant of a fair trial and warrant a new trial. By way of background, defendant admitted negligence at trial. Although negligence was admitted, the parties contested the nature and extent of the plaintiff's injury. Both parties retained neurologists. Plaintiff presented Drs. Chaston and Cohn. We presented Dr. Galbraith. Beginning with opening statement and continuing through closing argument, plaintiff had a theme and a strategy. And that theme and strategy was to belittle and ridicule Dr. Galbraith. Can we use the phrase hired gun first? Well, in opening, we had counsel. I'm referring to hired gun. Refer to Dr. Galbraith as a hired witness. Now, Dr. Galbraith, in his evidence deposition, denied he was a hired gun. Did he use the phrase? 98 to 100% of his cases are all pro-defendant. He is retained virtually exclusively by the defense. And I remember when I was in the law division, that was very detrimental once you got over 60%. Well. I mean, it was like common sense that the case was that he was questionable as a judge. I mean, let me be very clear here. We're not, we are not raising any issue as to how the cross-examination was conducted of Dr. Galbraith. We know very well, under Trower v. Jones and Sears v. Rudishour, that Dr. Galbraith could be cross-examined on his referrals and the percentage of his referrals and the source of his income to show his bias. That's not what this case is about at all. The problem that we have with it, counsel, though, is that in the deposition, plaintiff's attorney in cross-examination said, you were hired or retained. The next thing you know, this witness, who was rather flinty, says, it doesn't make me a hired gun. And he himself used the phrase hired gun several times to deflect what he felt was harmful cross-examination. He was anticipating, and I think anticipating rightly so. He was a volunteer. He was anticipating. He gave the plaintiff's lawyer ammo. I don't believe that that gives plaintiff license at that point than to start to refer to him as being and making a career out of this. I mean, first of all, I'm just talking about opening. I mean, opening is supposed to be a time when you, you know, present the issues out. Objectively, Mr. Reeses, hasn't he made his career out of that? I mean, he doesn't treat patients anymore. He is a Mayo Clinic-trained, board-certified neurologist. Over the course of a 45-year career, he's taught at the University of Minnesota. He's published in learned journals. He is a state court examiner for the state of Minnesota. He has been on staff at a number of hospitals, I think as many as 12 at a time. He stopped seeing patients as of 2010. And he didn't know what a spec test was. I'm sorry? He had no clue what a spec test was. As I said, this is cross-examination. And we're talking about what happens- He's supposed to be an expert that knows the most recent things in the field. He can be cross-examined, and that was brought up? We have no argument about the cross-examination. It's what happened in opening and what happened in closing. It's what happened before the cross and what happened after the cross. You say in your brief that this was a close case, so therefore we're to look at all of the alleged errors and say if there was a substantial error that it should be reversed. Yes. How is this a close case? In what way? I'm not disputing that. Not liability. On damages, if the jury had believed Dr. Galbraith based upon Dr. Galbraith's opinion on the fact that the plaintiff had no cognitive difficulties in a normal neurological examination in the emergency room and that the plaintiff underwent a neuropsychological exam two years after the accident, in November of 2008, and it was overall normal. So what you had was the plaintiff saying that from the beginning she had a head injury and over the course of time had treatment that was meant to deal with that head injury and the defense basically said she was either exaggerating or her doctors were making it up and you have an expert come in on the defense side to say that there's nothing to this claim of a lingering head injury. How does that make it a close case? It's a close case because you had this case turned on a medical testimony. The jury, if it had believed Dr. Galbraith, would have been entitled to a fine that the plaintiff did not sustain the traumatic brain injury, the closed head injury as she claimed. But they'd also have to disbelieve the plaintiff because you're basically saying, and this was talking about themes, the theme here was that the plaintiff was exaggerating or making it up. She was still able to go back to work. By your definition, implicitly then by your definition, any time that you have an expert witness, solely an expert witness, who disputes the testimony of lay witnesses and the experts on the other side, it becomes a close case. I'm saying that you had substantial evidence on both sides and the jury could have believed. What other evidence did the defense have? Well, I mean, we certainly had the fact that she didn't, we had objective examinations that showed a CAT scan, the MRI. We had objective tests that showed, putting aside the spec, I understand the spec, that was what Dr. Cohn testified to in rebuttal. But we had other objective tests that did not show the type of neurological injury or deficit that she claimed. But even your own doctor admitted that that wasn't conclusive. Well, I agree. It would not have been conclusive. It would have been for the jury. But the point is that instead of simply making an argument that's based on the evidence, okay, on either side of the question, we had a strategy, and it came to bear especially in closing argument. I've talked briefly about the opening when the reference is made to the fact that he's made a career out of being predictable and made a career out of the hired witness work. Okay, that's what he said in opening. That's got no place in an opening. But you get to the closing, and in closing he starts talking, again, this is all over objection, about referring to Dr. Galbraith as having made a career out of being predictable, who had a factory in her assembly line of defense opinions and report. I don't know where that came from. I think the testimony was he did four or five a week, now it's become a factory or an assembly line. And then, of course, you have the defense train comments about he's gone from coast to coast, from Maine to San Diego, back and forth again, raking in millions of dollars. Counsel, I used to try cases like this, and, you know, very often on one side of the V you had people who did almost all their work for plaintiffs, and you had people on the other side of the V that did almost all their work for defendants. I mean, that's who you guys brought to the dance floor here. You have to dance with the guy that you brought. Well, you know, I can't speak to – I understand in terms of experience, but if you look at cases going back – look, you can go back 30 or 40 years, to Reagan v. Vizza or Cecil v. Gibson, there are certain remarks, maybe it's like George Carlin's seven words that you can't say on TV or radio, that you're not supposed to say. Calling someone a hired gun – all right, the professional witness, the professional witness, okay, comment, the suggestion that he's a witness for hire, they have no place at a trial. The witness is the one who said it. All the lawyer said was you were hired or retained. Made a career out of it? It became a career when he stopped seeing patients. I don't see what the problem with that is. Having a factory or an assembly line? I mean, come on. Okay, I mean, if he did four or five a week, okay. Why don't you move along? Okay, all right. The other issue that we have concerns the trial court's ruling in disallowing the defense from presenting Rachel Yarrow's evidence deposition once she elected not to use it. The trial court ruled that we couldn't use it because Yarrow had not been disclosed as a Rule 213 fact witness. But Rule 213 didn't apply when Plaintiff was the one who took the evidence deposition for use at trial. But it's your own attorney, trial attorney, who tried to have it barred. The way that started was before we admitted negligence, Plaintiff took the evidence depositions of two out-of-state witnesses, Rachel Yarrow, Janet Dobbs, two of Plaintiff's coworkers, who were eyewitnesses to the accident. Once we admitted negligence, our position was, well, negligence is no longer an issue, so they shouldn't testify. And we made the motion. Now, now, Plaintiff wanted to use Dobbs's deposition to show, among other things, I think, that Plaintiff was thrown 10 feet into the air and landed outside the crosswalk. Okay? But Yarrow didn't see it. Yarrow didn't see it. But Yarrow said very clearly she was in the crosswalk. She didn't go 10 feet, and she wasn't outside the crosswalk. She was in the crosswalk. If we were to accept your position that this was error, even under the abuse of discretion standard, to have barred it for Rule 213, then we get to the issue of whether it's harmless error or not. And we have, again, your expert, Dr. Galbraith, testifying that the circumstances of whether she flew through the air and hit her head was basically irrelevant to the issue of damages. He didn't care whether she went 10 feet in the air and hit her head or not, because that was his testimony. And since it's being proffered, presumably, by the defense, to demonstrate that she didn't fly 10 feet through the air, and your own witness says it doesn't matter, why is that not harmless error? I don't think it's harmless error because, look, even putting aside what Dr. Galbraith said, okay, I think the jury is entitled to consider what the nature of the impact was. All right? And in closing argument, what are you supposed to do? But you happen to be inconsistent with the position your side took in the motion in limiting. No, no, no, no, no, no. It was not inconsistent. What we were simply saying was we didn't think either one of them could ‑‑ we didn't think either one of them should testify once negligence is withdrawn from an issue. Right. But, but, but, but, once you're going to have Dobbs testify, okay, once you have Dobbs testify, how are they surprised, how are they prejudiced in any way by having Yarrow testify? Instead, we have a trial lawyer who has to sit there during the trial and has no way to rebut the closing argument when plaintiff gets up and says, and Janet Dobbs said that the plaintiff flew 10 feet into the air and landed outside the crosswalk. Now, if that wasn't important, Justice Epstein, why would he make that comment? Well, he wasn't the one saying it wasn't important. The one who said it wasn't important was your expert. But all I'm saying is they're putting aside Galbraith's testimony. The jury still gets to consider the items. How can they put it aside? I mean, because the jury can simply say, I don't believe she was hit as hard and flew through the air the way that Dobbs testified. At least there would be a dispute. The problem, counsel, is that your expert's testimony diminishes the believability that this was really harmful. When he says it doesn't matter to him, I don't know why it should matter to the jury. But I still think that it would be up to the jury to decide. Again, we have to say something about Dobbs. We have to try to rebut Dobbs. We can't just let that testimony go. I think that we're perfectly appropriate in taking the position that neither one should testify, but if Dobbs is going to testify, Yarrow should testify. And we would refer the court to the proper procedure we think should be from Lebrecht v. Tooley, cited in our brief on page 20, that says basically that no party has the right to suppress an evidence deposition really by not offering its evidence. Before you wrap up, I have one question from your brief. And I understand you're trying to at trial, they're trying to make a demarcation in the medical treatment, that after a certain point in time the treatment wasn't related to the accident. Is that right? I believe that there was. I believe that Galbraith had testified that, I think it happened in October of 06, and I think that he drew a line somewhere in January, or somewhere that it was basically a soft tissue injury, and it would have resolved itself within a few months. Okay. But in your brief, then, you say that the medical expenses were $14,000. But at trial, your trial lawyer stipulated that the medical damages specials were actually $25,000. Doesn't that undo all of the claim that this treatment is, you know, for unrelated conditions? I think I'd have to go back and look at that stipulation because I don't remember. They stipulated it at the close of Plaintiff's case, right before actually the expert went in. There may have been a stipulation. Well, the stipulation, though, may have been to the fact that it was, we weren't necessarily stipulating to causation, but simply stipulating. See, it wasn't stipulated just to the foundation. I was going to suggest maybe to the foundation because I don't. I think that was a bit of an admission. Again, I think the record is going to answer that question. All right. At any rate, mindful that, and I know that my time is up, mindful that oral argument is a matter of grace and not a right. We are grateful for the opportunity to address the Court this morning. And we stand on our arguments, all the arguments we've made in our brief. We ask you to reverse and remand. Thank you very much. We're happy, as always, to see you. Thank you, Mr. Reeses. Thank you. Good morning, Your Honors. Michael Rasak on behalf of the Plaintiff. Appellee, Glenn Klingelholtz. I plan to be very, very brief, as I normally try to do. I'd like to say first, as I think the Court recognizes, it was not a close case. On the one side, not only do you have the opinion of the treating doctor, the neurologist in Minneapolis, you have the opinion of Dr. Cohen. You have three objective tests, the SPECT exam, the neuropsych testing. Aren't they complaining about that, that the second, when you bring in the other expert, that it's just cumulative? Dr. Cohen? Yeah. There was no objection at trial that he was cumulative. The only objection at trial had to do with whether or not he could be rebuttal or not. No one ever objected at any point during Dr. Cohen's testimony that he was cumulative. And, in fact, if I had to parse it down, although obviously at some point he repeated things, but he relied upon things that the treating neurologist didn't have, specifically the SPECT exam, and his focus was obviously on criticizing Dr. Galbraith. In addition, they had the neuropsych test, and she was also given the computer exam that they use for athletes to show whether there's a concussion or not. So on one side you have all of that. On the other side you have Dr. Galbraith. The court's questions indicate, you know, obviously the court's aware of the record. If there was a man that was a hired gun as a witness, this was his witness. If you bring somebody like that into the courtroom, surely you're going to have him cross-examined, and surely counsel's going to have a field day. But there are lines. There are clearly lines, and in this case he was not called a hired gun. He brought that out himself, and trial counsel, to his credit, did not jump on that. He left it alone. Saying that he made a career out of it, he did. That was his career for 10 years. Saying he made a great deal of money is true. He made $250,000 a year for 10 years. That's $2.5 million. He called them factories. What he was referring to at that point, by the way, was not the doctor, but rather the various businesses that the doctor worked for, that he identified that furnished expert witnesses, whose business it is to turn out expert witnesses. With respect to the witness, Yarrow, it's interesting. I just wanted to point out to the court that at the trial court level, the only basis that the defendant's counsel gave for trying to have Yarrow's evidence deposition introduced was that she was going to say that the plaintiff had crossed on the green. And I think by her argument, she was hoping to use Yarrow to say that the card had the green light. That's the only basis that defense counsel gave for putting it in. This thought that Yarrow would have said that the plaintiff landed inside the crosswalk rather than outside the crosswalk was a good creation by the appellate lawyer. He's trying to find some reason to find why her testimony should not have been admitted. She never saw anything. All she did was run ten feet forward with the SUV behind her. That's indicating in all likelihood the plaintiff was crossed some distance, as everybody said. But she never saw the incident itself, just like the defendant never did. So she could not have added anything had she taken the stand. Other than that the plaintiff was in the crosswalk. I explained to my brief, nobody cared where she was. Surely Dr. Galbraith did not care where she was. But Mr. Rees is correct when he raises the fact that if you have a fact that somebody actually was airborne for ten feet or something less than ten feet after being struck, there is some inference created that it was a greater impact than somebody who still remained in the crosswalk at the point of impact. I mean, human beings being what they are, they're going to make judgments based on that to some degree. I agree. If I could tell somebody somebody had been thrown ten feet at distance from me to you, that's going to raise something else. Curiously enough, I don't think even Dobbs actually said that. I think Dobbs said she was thrown back ten feet, which is not the same thing as being tossed through the air. I think that's in my brief pretty specifically. But the bottom line is if Yarrow had taken the stand, she could not do anything about that because she didn't see the impact. She didn't know if she was knocked up, back, sideways. All she could say is I ran ten feet forward and the SUV was behind me when I started. That was Yarrow's deposition testimony. It's hard to see how that would have changed anything in a case where the evidence is all stacked one way. Unless the Court has some specific questions for me, we've made all of our arguments in the brief and I would stand on the brief for the rest of them. Thank you. Thank you very much. Let's start with Rachel Yarrow for just a second. The defense counsel somehow wanted to talk about Rachel Yarrow testifying about the color of the light and the light being green. Not true. Actually, if you look at the trial transcript, it was Mr. Richardson, plaintiff's counsel, who says, referring to Rachel Yarrow now, that she was really only to testify that the plaintiff was crossing on a green. We could withdraw our evidence deposition based upon the stipulation, and that relates to admitting liability. We weren't withdrawing our motion to Barr because we wanted to present evidence about the color of the light. We wanted to present Yarrow's testimony to show that the plaintiff didn't land outside the crosswalk. That was the whole point. Dobbs doesn't testify. Yarrow's not. If they're going to offer Dobbs, we should be allowed to rebut that, number one. Going back to the remarks and Dr. Galbraith and all of that, look, there are lines that are drawn in the courtroom. There are certain arguments that I submit are beyond the pale. They have no role in the courtroom. They are demeaning to the judicial process and to the medical profession. The judge is the most important person in the courtroom in the jury's eyes. The judge is a person that commands authority and respect. This might have been a very different case if the trial judge had sustained some of those objections. In that event, maybe the plaintiff wouldn't have gone over the line, and I think he did go over the line, and to the extent that he went over the line. And, of course, if any of the objections had been sustained, it would be a different case because presumptively sustaining some of those objections could have cured at least some of the harm. But by voicing, by overruling those objections, the judge was voicing her approval for the jury to decide the case based on the arguments. The plaintiff went over the line repeatedly. We think those remarks should have been stricken, and we submit that the error was every bit as prejudicial here as it was in Reagan and Cecil, cases that are good law today as they were the day they were entered. For all the reasons set forth in our brief, again, we ask you to reverse and amend. Thank you. Thank you both. Thank you both. We will take it under advisement and get back to you directly. We're adjourned.